UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| DEKTRIX, LLC | : | Case No. ___1:21-cv-00030 |
| 1846 S. 1150 E. | : | |
| Bountiful, UT 84010 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ADIL BAGUIROV | : | |
| 1819 Troy St., | : | |
| Dayton, OH 45404 | : | |
| | : | |
| ISLOM SHAKHBANDAROV | : | |
| 1819 Troy St., | : | |
| Dayton, OH 45404 | : | |
| | : | |
| and | : | |
| | : | |
| AMERICAN POWER, LLC | : | |
| 1819 Troy Street | : | |
| Dayton, OH 45404 | : | |
| | : | |
| Defendants. | : | |

---

**COMPLAINT FOR BREACH OF CONTRACT AND SETTLEMENT
JURY TRIAL DEMANDED**

---

Plaintiff Dektrix LLC ("Dektrix"), by and through its Attorneys, files this Civil Complaint against Defendants Adil Baguirov, Islom Shakhbandarov and American Power, LLC, for breach of contract and alleges as follows:

**INTRODUCTION**

1.    Dektrix claims that two individual investors, Adil Baguirov ("Baguirov") and Islom Shakhbandarov ("Shakhbandarov") and/or their company American Power, LLC ("AMP" (together "Defendants") breached their contractual obligation to pay $650,000.00 in exchange for ownership in Dektrix LLC; breached their obligation in settlement of that

breach to pay $850,000.00; and breached their other agreements with Dektrix.

## JURISDICTION

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

3.    The Court has personal jurisdiction over the parties pursuant to Ohio's long arm statute, R.C. 2307.382.

4.    This case is related to the case of *American Power v. Harris et al.*, 3:17 cv 00347 (assigned to the Honorable Walter H. Rice) (the "*American Power Case*"). If the matters are joined, the court will have jurisdiction pursuant to 28 U.S.C. § 1367 because the claims set forth herein are so related to claims in that action that are within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## PARTIES

5.    Dektrix, LLC is a Nevada limited liability company whose headquarters were at all relevant times in Utah. Douglas Harris ("Harris") and Murray Crane ("Crane") were the managing members of Dektrix, LLC. The controlling interest in Dektrix, LLC was at all relevant times owned by Dektrix Intermodal, LLC, a Utah limited liability company. A smaller interest in Dektrix, LLC was owned by Defendants Baguirov and Shakhbandarov. The members of Dektrix Intermodal, LLC are Harris, Crane, and MM, LLC. MM, LLC is a Utah limited liability company owned by Mike Morley ("Morley") and his brother Mark Morley.

6.    Defendant Baguirov is a citizen of Ohio residing in or near Dayton, Ohio.

7.    Defendant Shakhbandarov is a citizen of Ohio residing in or near Dayton, Ohio.

8.      Defendant AMP is a Limited Liability Company organized under the laws of Ohio with its principle place of business at: 1819 Troy Street, Dayton, Ohio, 45404. AMP is owned by Defendants Baguirov and Shakhbandarov and is the Plaintiff in the *American Power Case.*

## FACTUAL BACKGROUND

**Dektrix's Business – Moving Freight on Innovative, Stackable Flat Decks**

9.      In about 2011, Crane designed an innovative freight transportation system described as an intermodal deck (*i.e.*, a flat-bed, open deck that could be used to carry freight on road and rail). It differed from traditional intermodal flat decks in that it could be collapsed and stacked for ease of transport when not loaded with freight. The first of these decks was developed by Crane at his Canadian company Raildecks. These decks were painted blue and will be referred to as the Blue Decks. Raildecks eventually went out of business.

10.     Fontaine Engineered Products, Inc. ("Fontaine") manufactured some of the Blue Decks for Raildecks and subsequently designed and manufactured its own collapsible intermodal flat decks based on Crane's design which were painted red (hereinafter "Red Decks").

11.     In about 2014, Crane started a Canadian company called Dektrix to implement a rail and road logistics business model using collapsible intermodal decks. "Dektrix" is a portmanteau of "Decks" and "Matrix" referring to the transportation system using the unique intermodal decks. Canadian Dektrix never raised enough capital to become a going concern and on or about December 15, 2014 it shuttered its business.

12.     In or about January 2015, MM LLC, Crane and Harris created the Nevada company Dektrix to implement Crane's rail and road logistics business model based in the United States.

**Successful Proof of Concept 2015-2016**

13.     Starting in about April 2015, Dektrix began moving freight using a fleet of 20 newly

manufactured Fontaine Red Decks.

14.     In about early June 2015, a Dektrix driver reported having observed the sheering of a brace pin used to fasten arm support braces that support the articulating arm assemblies on the Red Decks.

15.     Harris promptly called Buck Buchanan, president of Fontaine's Intermodal division, and reported the pin sheering incident.

16.     Over the next weeks, Fontaine upgraded each Red Deck's arm support assembly under warranty. Specifically, Fontaine hired a contractor, Steve Pasco of Intermodal Maintenance Group ("IMG"), in Chicago to weld the pins in place on every Red Deck.

17.     While Fontaine repaired the Red Decks' pins, Dektrix suspended shipping on any unrepaired decks.

18.     Following the upgrade, Dektrix put the Red Decks back in service and, by June 2016, had successfully moved more than 800 loads of freight experiencing no mechanical problems.

19.     The success with 20 Red Decks gave "proof of concept" for Dektrix's business model.

**Growth and Investment**

20.     The proof of concept also showed that, to be profitable, Dektrix would need to take advantage of economies of scale which would require significant expansion: the acquisition of additional decks; freight yards; workers; etc.

21.     The needed expansion would, in turn, require Dektrix to obtain increased capital to avoid cash flow problems.

22.     In anticipation of the need for additional operating capital, in about May 2016, Harris began preparing Dektrix investment documents including a Private Placement Memorandum ("PPM"), a Subscription Agreement, an Executive Summary, a Purchaser Questionnaire, a

Non-Disclosure Agreement ("NDA") and an Operating Agreement.

23. The PPM sought $3.5 Million in capital investment in exchange for 240,000 membership units. The Subscription Agreement effectively qualified which potential investors were accredited. The Executive Summary summarized Dektrix's business purpose and plan without disclosing confidential business information. The Purchaser Questionnaire required potential investors to affirm and demonstrate their qualifications as accredited investors. The Operating Agreement disclosed Dektrix's agreed practices rules of governance.

24. On or about June 8, 2015, following the success Dektrix had with 20 Red Decks, Fontaine expanded Dektrix's lease to a total of 73 Red Decks (including the original 20 Red Decks) which Fontaine valued at approximately $50,000/deck.

25. As the expansion expenses outpaced its revenues, Dektrix's cash flow concerns were realized and by about July 2016, Dektrix was struggling to stay current on lease payments to Fontaine.

26. In early June 2016, Defendant Shakhbandarov initiated a phone call with Harris indicating that he had seen Dektrix's Red Decks in California and was interested in them.

27. Shakhbandarov again called Harris on June 16, 2016, this time joined by Baguirov, to inquire about investing as a "partner" in Dektrix.

28. This call was confirmed in a June 16, 2016 email from Harris to Baguirov and Shakhbandarov at the email addresses they provided during the call: Adil@americanpowertransport.com and Islom@americanpower.com (sic).

29. On June 20, 2016 Shakhbandarov sent an email to Harris requesting additional investment information from Harris on behalf of himself and his partner, Baguirov. EX 1, June 20, 2016 email from Shakhbandarov to Harris.

30. On June 24, 2016 Harris re-sent Dektrix's NDA and sent a copy of Dektrix's Executive Summary to Shakhbandarov inviting further discussion after the NDA was executed and returned.

31. On June 27, 2016 Shakhbandarov returned the signed signature page for the Dektrix NDA "Effective Date: June 24, 2016" to Harris.

32. On June 29, 2016 Shakhbandarov told Harris that Baguirov and Shakhbandarov could bring other investors to Dektrix.

33. This conversation was confirmed in a June 29, 2016 email to Shakhbandarov and which included another copy of Dektrix's Executive Summary and PPM and highlighting the risks to investors. EX 2, June 29, 2016 email from Harris to Shakhbandarov with attached Executive Summary and PPM.

34. In about mid-July 2016, Baguirov and Shakhbandarov expressed to Harris their interest in earning membership units in Dektrix by getting others to invest in Dektrix.

35. To that end, Baguirov and Shakhbandarov represented to Harris that Baguirov and Shakhbandarov were influential members of the Turkish/American community in Dayton, OH and that they had business investment contacts in other Turkish/American communities as well as in Turkey (collectively the "Turkish Community").

36. On or about July 20, 2016, Dektrix representatives Harris and Crane met with Baguirov and Shakhbandarov in Dayton, Ohio, where they introduced Harris and Crane to many of their friends and associates. EX 3, July 20, 2016 email Harris to Shakhbandarov.

37. Baguirov and Shakhbandarov expressed confidence that their investment contacts in the Turkish Community could generate far more that the $3.5 Million Dektrix sought in its initial PPM

6

38.     On Saturday, July 23, 2016 Harris met with Shakhbandarov and a group of potential investors from the Turkish community in New York.

39.     Before the meeting started, Shakhbandarov asked Harris to revise the investor presentation and the PPM to reflect a $6 Million capitalization.

40.     On August 4, 2016, Fontaine offered Dektrix the exclusive rights to purchase Red Decks (*i.e.*, Fontaine would not sell to any competitor for a period of up to three years) if Dektrix would purchase the 73 leased Red Decks for $13,698.63 per deck and agree to order another 43 Red Decks to be built and purchased at a later date and at a market (higher) price.

41.     In connection with Fontaine's efforts to sell the Red Decks to Dektrix, Buck Buchanan ("Buchanan") and Hank Prochazka ("Prochazka") of Fontaine represented to Dektrix that if Dektrix purchased the Red Decks, Fontaine would forgive Dektrix's past failures to make lease payments.

42.     Shakhbandarov, Baguirov and AMP set up several meetings in various locations with dozens of individuals whom Baguirov and Shakhbandarov represented to be potential investors.

43.     Notwithstanding Defendants' many representations of being able to provide investors to Dektrix, no potential investor who Defendants introduced to Dektrix (other than Baguirov who was introduced to Dektrix by Shakhbandarov) ever made any investment in Dektrix.

44.     Notwithstanding Defendants' many representations of their interest in investing in Dektrix, Defendants had not made any investment before December 2016.

45.     In 2016 Dektrix was also negotiating for an investment from Knight Transportation, Inc. (a multi-billion dollar transportation company) ("Knight").

46.     On or about December 2, 2016, Knight proposed to purchase 85% of Dektrix in exchange for Knight infusing as much as $60,000,000.00 into Dektrix, purchasing additional decks,

bringing new customers to Dektrix, and restructuring Dektrix's debt.

47.     On or about December 2, 2016, and facing the loss of control of Dektrix to Knight as a possible necessity, Dektrix asked Baguirov and Shakhbandarov what investment they could commit to immediately.

48.     Baguirov and Shakhbandarov said they could come up with $1 Million. This was confirmed in an email from Harris to Baguirov and Shakhbandarov on December 2, 2016.  EX 4, December 2, 2016 email from Harris to Baguirov and Shakhbandarov.

49.     On December 5, 2016, Harris sent a copy of Dektrix's detailed Financial Report to Baguirov and Shakhbandarov.  EX 5, December 5, 2016 email and Financial Report from Harris to Baguirov and Shakhbandarov.

50.     On December 5, 2016, Baguirov and Shakhbandarov agreed to purchase 200,000 membership units in Dektrix, LLC for $1,000,000.00.   EX 6, Membership Purchase Agreement.

51.     Under the terms of the MPA, Baguirov and Shakhbandarov were to pay $350,000.00 by December 5, 2016 for 70,000 preferred membership units and agreed to pay the remaining $650,000.00 obligation no later than January 15, 2017 for the remaining 130,000 preferred membership units.

52.     Baguirov and Shakhbandarov purchased Dektrix membership units at a lower price than was contemplated in the then-current $6 Million PPM and lower than was contemplated in Dektrix's original $3.5 PPM.

53.     In connection with entering into the MPA, Dektrix expressly suspended its PPM to allow Baguirov and Shakhbandarov to purchase at a lower price than had been offered to other potential investors (including those introduced to Dektrix by Baguirov and Shakhbandarov).

EX 6 MPA, Addendum A.

54. On December 5, 2017, Baguirov wired to Dektrix $350,000.00.

55. In reliance on Baguirov and Shakhbandarov's commitment in connection with the MPA, Dektrix suspended its negotiations with Knight.

**Preparation for Constellium Contract – Need to Replace Bolts**

56. On or about December 22, 2016, Dektrix secured a new shipping contract with Wise Alloys d.b.a. Constellium ("Constellium").

57. In preparation for performing on the Constellium contract, Crane asked Fontaine whether Dektrix needed to do anything to prepare the Red Decks.

58. Thereafter (but before January 12, 2017) Fontaine provided Crane with detailed directions to replace the brake hub assembly bolts on the Red Decks and use a new lock-tite product to secure them. EX 7, Fontaine Power Point - Evolution Axel/Hub Bolt Installation & Tightening Instruction.

59. On or about January 12, 2017, Dektrix managers, Harris and Crane, together with Baguirov and Shakhbandarov, inspected the fleet of Dektrix Red Decks in Chicago and learned that it appeared some bolts were missing from some of the brake house assemblies.

60. Dektrix began preparing to replace the bolts as instructed by Fontaine.

**Defendants' First Breach – January 15, 2017**

61. Defendants Baguirov and Shakhbandarov failed to pay Dektrix $650,000.00 on or before January 15, 2017 in breach of their duty under the December 5, 2016 MPA.

62. On January 16, 2017, Harris confronted Baguirov and Shakhbandarov with their breach and renewed the demand for payment. *See* EX 8, January 16, 2017 email from Harris to Baguirov and Shakhbandarov.

63.    Harris warned Defendants that without the promised investment, Dektrix "will not know how to proceed." *Id.*

64.    On January 18, 2017, Baguirov acknowledged the breach and proposed a settlement of any breach under the following terms: AMP would pay $850,000.00 in 3-4 weeks and about $150,000.00 within a week and asked Harris if Dektrix would extend the deadline to pay based upon the promise of additional money.

**Continued Fleet Preparation – Communication with Fontaine**

65.    On or about January 24, 2017 Dektrix inspected the fleet of Red Decks in California and began attempting to replace bolts on the brake house assembly per Fontaine's directions.  In doing so, Dektrix, discovered that bolts were not simply loose or missing, but were, in fact, sheered, some leaving a remnant of the bolt lodged in the brake hub assembly.

66.    The lodged bolt remnant presented an unexpected challenge in replacing the bolts as directed by Fontaine: removing the lodged bolt fragments before replacing with new bolts. Specifically, the location of the sheered bolts was not easily accessible making removal of the fragments difficult.

67.    On January 25, 2017, Harris informed Fontaine (through Buchanan and Prochazka) that the problems with the Brake House Assembly bolts appeared to be more than a maintenance issue involving loose bolts.  EX 9, January 25, 2017 email from Harris to Hank Prochazka and Buck Buchanan re: Evolution Mechanical Issues.

**Agreement to Resolve Defendants' First Breach (Settlement)**

68.    Between January 24 and 31, 2017, Baguirov and Shakhbandarov and Dektrix negotiated possible settlement terms for Baguirov and Shakhbandarov's breach.

69.    To that end, Dektrix sent Baguirov and Shakhbandarov a proposed MPA Addendum with

terms to settle the prior breach. Dektrix's proposed MPA Addendum confirmed that Baguirov and Shakhbandarov (the "Buyer" in the MPA) "ha[d] not fulfilled its commitment to provide the additional $650,000.00 by the represented date. . ." EX 10, January 25, 2017 email from Harris to Baguirov and Shakhbandarov with draft Addendum.

70. Dektrix's proposed MPA Addendum also modified the MPA to increase the amount of the purchase to $850,000.00 for 150,000 preferred membership units and to give Defendants an extension from the expired funding date of January 15, 2017 to February 20, 2017 to fully fund the new commitment.

71. On or about January 25, 2017 Baguirov and Shakhbandarov counter-proposed a settlement, accepting the terms of Dektrix's proposed MPA Addendum, but moving their performance date out to March 1, 2017 instead of February 20, 2017.

72. Defendants' proposed version of the settlement modification to the MPA Addendum retained the confirmation that Defendants "ha[d] not fulfilled its (sic) commitment to provide the additional $650,000.00 by the represented date. . ." EX 11, January 25, 2017 email from Baguirov to Harris with attached Highlighted Proposed MPA Addendum B as Revised by AMP.

73. On or about January 31, 2017, Dektrix representatives agreed to settle the breach by executing the MPA Addendum B with the modifications Baguirov and Shakhbandarov proposed.

74. On or about January 31, 2017, the Defendants also agreed to settle their breach pursuant to the terms of the MPA Addendum B language as modified by Baguirov and Shakhbandarov. Specifically:

    a.    Defendant AMP represented to the court that "The parties executed Addendum B to

the Membership Purchase Agreement. . . ." *See, AMP v. Harris et al*, 3:17-cv-00347-WHR, Doc. 36 AMP's Memorandum in Opposition to Dektrix's motion to dismiss, PAGEID #429 n. 14 (citing Doc. 036-1, Exhibit 1, Addendum B to the MPA);

    b.    *See, also, Id.* at PAGEID #395 (American Power has separately represented to this Court that "Addendum B to the MPA, specifically modif[ied] the MPA").

75.    Per the settlement terms of Addendum B to the MPA, Dektrix agreed to extend the date to perform on the commitment for Baguirov and Shakhbandarov to purchase membership units from January 15, 2017 to March 1, 2017 and Baguirov and Shakhbandarov agreed to pay Dektrix $850,000.00 instead of $650,000.00. Addendum B also included modifications to the MPA's original option for the purchase of additional membership units. EX 12, Final Addendum B to MPA.

**Lease Termination and Deck Purchase Efforts**

76.    On Monday, February 6, 2017, Harris got a letter via FedEx from Fontaine purporting to terminate the lease on the Red Decks.

77.    On Tuesday, February 7, 2017 Harris spoke separately with Morley and Prochazka to discuss the Fontaine termination of lease letter and Dektrix's options. Prochazka told Harris that there was no problem with the Red Decks or the unpaid lease obligations that could not be solved by Dektrix making some acceptable payment to Fontaine.

78.    On Tuesday, February 7, 2017 (12:38PM MTN) Dektrix forwarded Fontaine's lease termination letter to all Dektrix members including Defendants Baguirov and Shakhbandarov and reported on the conversations with Morley and Prochazka. EX 13, February 7, 2017 email from Harris to Baguirov and Shakhbandarov with attached Fontaine Lease Termination Letter.

79. The February 7, 2017 email also told Baguirov and Shakhbandarov that Blue Decks were available for purchase from Boyd Brothers and that Harris and Crane would be meeting with Boyd to negotiate the purchase of those Blue Decks. *Id.*

80. On or about February 9, 2017, Harris and Crane met with Fontaine executives, including Prochazka, John Craig and Stacey Stone, in Jasper, AL, to discuss options going forward.

81. Fontaine assured Dektrix that it could address the bolt problem and that it would not compel the return of the decks if Dektrix were to purchase the 73 Red Decks on mutually agreeable terms.

82. Accordingly, Dektrix had no reason to believe Fontaine considered the Red Decks irreparable or inherently unsafe at the time any Defendant committed to any investment obligation.

83. At all times Dektrix believed the Red Decks were repairable and would be safe and functional in their repaired condition.

84. On or about February 10, 2017, Harris and Crane met with Dwight Bassett, Boyd Brothers' COO, and reached an agreement to purchase 53 Blue Decks for $5,500 each.

85. Immediately after reaching the agreement with Boyd Brothers, Harris and Crane spoke with Baguirov over the phone and told him the details of the agreement.

86. On or about February 27, 2017, Dektrix offered to purchase the 73 leased Red Decks from Fontaine for $1 Million on financing terms. EX 14, February 27, 2017 email from Harris to Prochazka and others with attached Fontaine Equipment Purchase Offer and Agreement to Sell ("Red Deck Offer").

87. On February 27, 2017, Harris copied Baguirov and Shakhbandarov on the Red Deck Offer made that same day. EX 15, February 27, 2017 email from Harris to Baguirov and Shakhbandarov.

13

**Defendants' Partial Performance on the MPA Addendum B (Settlement)**

88.　By late February 2017, Harris had informed Baguirov and Shakhbandarov that Dektrix was in urgent need of cash due to Defendants' failure to pay on January 15, 2017 as agreed.

89.　Prior to February 28, 2017, Defendants represented to Harris that AMP was in the process of securing a loan for $850,000.00 to pay its obligation but that the process was taking longer than expected.

90.　Knowing Dektrix's urgent need for immediate cash, and knowing Dektrix blamed its dire circumstances on Defendants' failure to fund on January 15, 2017 as agreed, Defendants told Harris that AMP would get an interim loan of $100,000.00 (even if it required Defendants to agree to a high interest rate) in order to pay Dektrix something toward Defendants' obligation while awaiting their bank's loan to fund.

91.　On or about February 28, 2017, Defendants transferred to Dektrix the sum of $100,000.00. Baguirov and Shakhbandarov represented that this money came from a high interest loan.

92.　Baguirov told Harris that with the $100,000.00 high interest loan and the expected bank loan of $850,000.00, Defendants hoped to pay Dektrix a total of $950,000.00.  EX 16, February 28, 2017 email from Baguirov to Harris.

93.　Dektrix received the $100,000.00 as payment toward Defendants' $850,000.00 obligation under the modified MPA.

94.　AMP through Baguirov confirmed that the $100,000.00 was an "investment in exchange for membership interest."  EX 17, March 6, 2017 email from Baguirov to Harris, point 8.[1]

---

[1]This March 6, 2017 email also contains a litany of fabricated grievances, self-serving misstatements as well as complete falsehoods disparaging of Dektrix. Dektrix does not concede that any of Baguirov's other hearsay statements are truthful.

14

**Capitalization Strategy and Assignment of Beneficial Use Agreement**

95. On February 28th, 2017, Dektrix and AMP signed an Assignment of Beneficial Use Agreement ("ABUA") in which AMP represented it owned certain decks and was willing to assign all beneficial use of those decks to Dektrix in exchange for a Promissory Note. EX 18, March 1, 2017 email from Baguirov to Harris with attached executed ABUA.

96. The ABUA was a part of a capitalization strategy in which American Power sought to borrow $850,000.00 from its bank to fulfill its obligation to invest in Dektrix and to still have enough money to repay its higher interest rate loan for $100,000.00.

97. Dektrix cooperated in the capitalization strategy to assist Defendants in fulfilling Baguirov and Shakhbandarov's $850,000.00 investment obligation.

98. The capitalization strategy contemplated the following simultaneous closings:

   a. AMP was to close on a loan from its bank, borrowing $850,000.00;

   b. AMP was to pay Dektrix $850,000.00 for membership units pursuant to the MPA Addendum B;

   c. Dektrix was to purchase from Fontaine 30 Red Decks outright and 43 other Red Decks on payment terms (pursuant to Dektrix's exclusive rights agreement with Fontaine to purchase Red Decks for $13,698.63 each), for an initial cost of $410,958.90;

   d. Dektrix was to sell AMP those 30 Red Decks and give AMP a second lien position in all decks Dektrix purchased;

   e. The party financing the purchase of the Red Decks (presumably AMP's bank for 30 Red Decks and Fontaine for 43 Red Decks) ultimately was to hold the first lien position;

    f.      Through the ABUA, AMP was to assign to Dektrix the beneficial use of the 30 Red Decks AMP was to acquire at the closing;

    g.      Dektrix was to pay AMP $100,000.00 pursuant to the terms of a promissory note as an inducement for AMP to enter into the ABUA;

    h.      Dektrix was to make payments to Fontaine and was to pay AMP on the ABUA promissory note: at first from the remaining operating capital ($850,000.00 – $410,958.90 = $439,041.10); and eventually from anticipated income generated by the use of the decks.

99.    On February 27, 2017, Dektrix was negotiating to purchase Red Decks; and had already negotiated the purchase of Blue Decks on favorable terms (either of which could have been put in service to fulfill contracts with Dektrix customers).

100.    Pursuant to the ABUA, on or about March 14, 2017, Dektrix made an initial payment to Defendant AMP. On information and belief Dektrix's payment was $7,500.00.

**Defendants' Second Breach – March 1, 2017 (Breach of Settlement)**

101.    Despite Dektrix having made good faith efforts to accommodate Defendants in performing on their obligations under the Parties' agreements, Defendants ultimately failed to pay the remaining $750,000.00 of the $850,000.00 they owed on or before March 1, 2017 as required under the January 31, 2017 Addendum B to the MPA.

102.    Defendants asked Dektrix to continue to pursue the capitalization strategy after the March 1, 2017 breach. To that end, the Parties continued to work toward the simultaneous closing.

103.    However, Defendants never did come up with the $750,000.00 remaining investment money they owed Dektrix.

104.    As a result, Dektrix was unable to acquire either Red Decks or Blue Decks.

105.    By about May 2017, Dektrix was no longer a going concern.

## COUNT I – BREACH OF CONTRACT

106.    Pursuant to the MPA Defendants were obligated to pay Dektrix $650,000.00 by January 15, 2017.

107.    Defendants breached that agreement by failing to pay the pledged amount as they contracted.

108.    Additionally or alternatively, pursuant to the MPA Addendum B, Defendants were obligated to pay $850,000.00 by March 1, 2017 to settle any claim of breach on January 15, 2017.

109.    Defendants breached that settlement agreement by failing to pay the pledged amount as they contracted.

110.    Pursuant to the terms of the ABUA, Defendant AMP was required to assign the beneficial use of decks to Dektrix.

111.    Defendants never assigned the beneficial use of any decks to Dektrix.

112.    Defendant AMP was not entitled to any portion of any inducement payment because AMP did not assign to Plaintiff the beneficial use of any decks.

113.    Defendant AMP never returned any inducement payment.

114.    Dektrix demanded payment of the $650,000.00 in January 2017.

115.    Dektrix demanded payment of the $850,000.00 on or about March 28, 2018.

116.    As a foreseeable consequence of the breaches by Baguirov, Shakhbandarov and AMP, Dektrix lacked the resources to purchase 73 Red Decks from Fontaine or 53 Blue Decks from Boyd Brothers (or to otherwise get any decks from any source); could not move freight; and therefore lost the anticipated revenue from either active or potential carrier agreements.

117.    Due to Defendants' repeated breaches, by May 2017, Dektrix lost access to all decks; was forced to lay off over a dozen workers; had to close its two freight yards in CA and IL; lost

17

its leased fleet of commercial trucks; lost its insurance coverage (and its future insurability); lost its authorized standing with the United States Department of Transportation; and was unable to pay on its debts to creditors and investors.  Unable to perform its core services, Dektrix no longer had any ability to generate income and had nothing to attract Knight nor any other potential investor to invest in Dektrix.  Accordingly, Dektrix membership units were of no value following Defendants' breach of contract.

118.    As a result of Defendants' failure to pay, Dektrix's business collapsed and was damaged in an amount to be proven at trial, but not less than $757,500.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dektrix LLC prays for relief against all Defendants jointly and severally as follows:

A.    Damages as a result of Defendants' breach of contract in an amount to be proven at trial, in excess of $75,000, exclusive of interests and costs.

B.    Compensatory Damages in the form of attorney's fees and costs for breach of settlement agreement;

C.    Pre-judgment and post-judgment interest from the date of the breach at the highest rate allowed by law on any such amount;

D.    Any other relief that the Court deems just and proper.

Respectfully submitted,

s/ Charles E. Reynolds, Esq
Charles E. Reynolds (0019935)
Brian P. O'Connor, Esq. (0086646)
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, Ohio 45202
Telephone (513) 721-4450

Facsimile: (513) 852-5969
cer@Santen-Hughes.com
bpo@Santen-Hughes.com
*Attorneys for Dektrix LLC,*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all matters so triable.

s/ Charles E. Reynolds, Esq
Charles E. Reynolds (0019935)
Brian P. O'Connor, Esq. (0086646)
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, Ohio 45202
Telephone (513) 721-4450
Facsimile: (513) 852-5969
cer@Santen-Hughes.com
bpo@Santen-Hughes.com
*Attorneys for Dektrix LLC*

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Dektrix, LLC
1846 S. 1150 E
Bountiful, Utah 84010

**(b)** County of Residence of First Listed Plaintiff    Davis County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Charles E. Reynolds & Brian P. O'Connor
Santen & Hughes
600 Vine Street, Suite 2700, Cincinnati, Ohio 45202

## DEFENDANTS

Adil Baguirov, Islom Shakhbandarov & American Power, LLC
1819 Troy Street
Dayton, OH 45404

County of Residence of First Listed Defendant    Montgomery County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Martin A. Foos
201 E. Sixth Street
Dayton, Ohio 45402

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☐ 2   U.S. Government Defendant

☐ 3   Federal Question *(U.S. Government Not a Party)*

☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332

Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
757,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
01/14/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Charles E. Reynolds

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.